ORIGINAL

# United States Court of Appeals for the Federal Circuit

FILED
JUL 14 2008
U.S. COURT OF FEDERAL CLAIMS

2007-5020

WESTERN SHOSHONE NATIONAL COUNCIL, and
TIMBISHA SHOSHONE TRIBE,

Plaintiffs-Appellants,

and

SOUTH FORK BAND, WINNEMUCCA INDIAN COLONY, DANN BAND, BATTLE MOUNTAIN BAND, ELKO BAND, and TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS,

Plaintiffs-Appellants,

v.

UNITED STATES

Defendant-Appellee.

---

## Judgment

ON APPEAL from the United States Court of Federal Claims

in CASE NO(S). 05-CV-558.

This CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

AFFIRMED.

ENTERED BY ORDER OF THE COURT

DATED MAY 22 2008

Jan Horbaly, Clerk

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
By: Date: 7/14/08

ISSUED AS A MANDATE: JUL 14 2008

# United States Court of Appeals for the Federal Circuit

2007-5020

WESTERN SHOSHONE NATIONAL COUNCIL and
TIMBISHA SHOSHONE TRIBE,

Plaintiffs-Appellants,

and

SOUTH FORK BAND, WINNEMUCCA INDIAN COLONY, DANN BAND, BATTLE MOUNTAIN BAND, ELKO BAND and TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Treva J. Hearne, Hager & Hearne, of Reno, Nevada, argued for plantiffs-appellants Western Shoshone National Council, et al. With him on the brief was Robert R. Hager.

Jeffrey M. Herman, Herman & Mermelstein, P.A., of Miami, Florida, argued for plaintiffs-appellants South Fork Band, et al. With him on the brief was Stuart S. Mermelstein.

Mark R. Haag, Attorney, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Ronald J. Tenpas, Acting Assistant Attorney General, and Sara E. Culley, Attorney. Of counsel on the brief was Maria K. Wiseman, Office of the Solicitor, United States Department of the Interior, of Washington, DC.

Appealed from: United States Court of Federal Claims

Senior Judge Loren A. Smith

# United States Court of Appeals for the Federal Circuit

2007-5020

WESTERN SHOSHONE NATIONAL COUNCIL, and
TIMBISHA SHOSHONE TRIBE,

Plaintiffs-Appellants,

and

SOUTH FORK BAND, WINNEMUCCA INDIAN COLONY, DANN BAND, BATTLE MOUNTAIN BAND, ELKO BAND, and TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS,

Plaintiffs-Appellants,

v.

UNITED STATES

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in case no. 05-CV-558, Senior Judge Loren A. Smith.

DECIDED: May 22, 2008

Before RADER, SCHALL, and PROST, Circuit Judges.

RADER, Circuit Judge.

The Western Shoshone seek to invalidate a 1977 Indian Claims Commission (ICC) judgment awarding compensation for the taking of the Western Shoshone's aboriginal lands in Idaho, Utah, Nevada, and California. The Western Shoshone also seek additional compensation and other relief under the Treaty of Ruby Valley of 1863. The United States Court of Federal Claims granted the United States' motion to dismiss the Western Shoshone's action for lack of subject matter jurisdiction and for failure to

state a claim. Because the Appellants filed their challenge twenty-four years after the Court of Claims affirmed the ICC's judgment, and because legislation specifically precludes the Appellants' current challenge, this court affirms.

I

The Western Shoshone include numerous tribes or bands of Native American Indians. For all of modern history, the Western Shoshone have occupied land in parts of what are now Idaho, Utah, Nevada, and California. Before the westward expansion of the United States, the Western Shoshone lived in extended family groups, or bands, and congregated together for ceremonies and food gathering. Today, the Western Shoshone live in various communities or colonies on the same land.

During the Civil War, the Union sought the natural resources of the West and entered into a series of treaties with the Indians to ensure access to those resources. Between July and October of 1863, the Union negotiated five treaties with various groups of Shoshone Indians, including the Treaty of Ruby Valley (Treaty) with the Western Shoshone, U.S.-W. Shoshone, Oct. 1, 1863, 18 Stat. 689. See Nw. Bands of Shoshone Indians v. United States, 324 U.S. 335, 340-42 (1945). Article 4 of the Treaty provided that "the Shoshone[] country may be explored and prospected for gold and silver, or other minerals; and when mines are discovered, they may be worked, and mining and agricultural settlements formed . . . ." Article 5 defined the boundaries of "the country claimed and occupied by" the Western Shoshone. Article 6 provided that the President had discretion to force the Western Shoshone to move to reservations within the territory defined by Article 5. And Article 7 provided that the United States

would compensate the Western Shoshone $5,000 per year for twenty years for agreeing to the Treaty's terms.

In 1946, Congress enacted the Indian Claims Commission Act (ICCA), codified as amended at 25 U.S.C. § 70 et. seq. (1976 ed.), to settle the Indian tribes' historical claims against the United States for the taking of land and related actions. In sum, the ICCA undertook to "dispose of the Indian claims problem with finality." United States v. Dann, 470 U.S. 39, 45 (1985) (quoting H.R. Rep. No. 79-1466, at 10 (1945)). The ICCA gave the ICC exclusive jurisdiction to hear claims brought within five years of the passage of the Act. Section 12 of the ICCA provided:

> The Commission shall receive claims for a period of five years after the date of the approval of this Act and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

25 U.S.C. § 70k (1976). As a result, Indian claims existing on August 13, 1946 had to be filed by August 13, 1951 or be barred forever. See United States v. Lower Sioux Indian Cmty., 519 F.2d 1378, 1383 (Ct. Cl. 1975); see also Navajo Tribe of Indians v. United States, 601 F.2d 536, 538 (Ct. Cl. 1979) ("The applicable statute of limitations in the [ICCA] is a jurisdictional limitation upon the authority of the Commission to consider claims.").

In 1951, various Shoshone tribes, including the Appellant Te-Moak Band of the Western Shoshone, filed a joint petition with the ICC for the alleged taking of over 80 million acres of land, including the territory described in the Treaty of Ruby Valley. Shoshone Nation v. United States, 11 Ind. Cl. Comm. 387, 397, 419 (1962); see also Dann, 470 U.S. at 41-42. The petitioners also sought an accounting. See Te-Moak Bands of W. Shoshone Indians v. United States, 18 Cl. Ct. 82, 83 (1989).

The ICC "found that the Western Shoshones were separate from the other Shoshones and that the Te-Moak Bands were representative of the Western Shoshones." Te-Moak, 18 Cl. Ct. at 84 (citations omitted). As a result, the ICC "required the Te-Moak Bands to file a separate amended petition on behalf of the Western Shoshones." Id.

In 1962, the ICC found that the United States had effectively taken the Western Shoshone lands by allowing settlers and other non-native Americans to encroach upon the lands; the parties later stipulated that the Western Shoshone's aboriginal title was extinguished on July 1, 1872. Shoshone Nation, 11 Ind. Cl. Comm. at 416; see also Te-Moak Band of W. Shoshone Indians v. United States, 593 F.2d 994, 996 (Ct. Cl. 1979). In 1972, the ICC determined the value of taken Western Shoshone property to be $26,145,189.89, including $4,604,00.00 for minerals extracted from the land in Nevada before the date of the taking. See Te-Moak Band, 593 F.2d at 996.

In 1974, a group of Western Shoshone Indians called the Western Shoshone Legal Defense and Education Fund Association (Association) attempted to intervene in the ICC proceedings. The Association, which the federal government did not formally recognize, contended that its lands were never taken, and that the Te-Moak Bands and the United States had colluded to treat the title as extinguished. The Association attempted to repudiate all sums that the Commission awarded to the Western Shoshone. Instead the Association contended that its constituents still held legal title to the property. The ICC dismissed the intervention as untimely. The United States Court of Claims affirmed the decision. W. Shoshone Legal Def. & Educ. Ass'n v. United

States, 35 Ind. Cl. Comm. 457 (1975), aff'd, 531 F.2d 495 (Ct. Cl.), cert. denied, 429 U.S. 885 (1976).

In 1977, the Appellant Te-Moak Band attempted to change its position, asserting that it still held title to the claimed land on behalf of the Western Shoshone. See Te-Moak Band, 593 F.2d at 996. The Te-Moak Band also retained new counsel and moved for a stay of the proceedings. Id. at 997. The ICC denied the motion to stay and entered a final judgment awarding the Western Shoshone $26,145,189.89. Te-Moak Bands of W. Shoshone Indians ex rel. W. Shoshone Nation v. United States, 40 Ind. Cl. Comm. 318 (1977), aff'd, 593 F.2d 994 (Ct. Cl.), cert. denied, 444 U.S. 973 (1979). In 1979, the Court of Claims affirmed the award. Te-Moak Band, 593 F.2d 994. The Clerk of the Court of Claims certified the award to the General Accounting Office, which deposited the amount of the award into an interest-bearing trust account for the Western Shoshone on December 6, 1979. Dann, 470 U.S. at 42.

In 1987, the Appellant Timbisha Shoshone Tribe and two other Western Shoshone tribes sought to intervene with the accounting claims. This action asserted that the United States owed the Western Shoshone all revenues generated by the land until at least 1979. Te-Moak Bands, 18 Cl. Ct. at 83-85. Furthermore, the intervenors sought a general accounting for the United States' alleged misuse of revenues from the land, which had been held in trust by the United States. Id. at 84-85. The Court of Claims denied the motion to intervene as untimely. Id. at 89.

In 2004, Congress passed and the President signed into law provisions for the distribution of the ICC award from the trust account. Western Shoshone Claims Distribution Act, Pub. L. No. 108-270, 118 Stat. 805 (2004). The Act provides "for the

use and distribution of the funds awarded to the Western Shoshone," and authorizes the Secretary of the Interior to promulgate implementing regulations. Id. § 5. In 2007, the Secretary issued regulations that establish an enrollment process to allow individuals to apply for a share of the Western Shoshone award in the trust account. 72 Fed. Reg. 9,836 (Mar. 5, 2007).

The Appellants include two groups of Western Shoshone tribes and bands. The first group includes the South Fork Band, Winnemuca Indian Colony, Dann Band, Battle Mountain Band, Elko Band, and Te-Moak Tribe of Western Shoshone Indians (South Fork Band). The second group includes the Western Shoshone National Council and Timbisha Shoshone Tribe (National Council).

The Appellants originally filed their action in the U.S. District Court for the District of Columbia in 2003. The district court granted the United States' motion to transfer all but one of the claims to the Court of Federal Claims.* W. Shoshone Nat'l Council v. United States, 357 F. Supp. 2d 172 (D.D.C. 2004). The plaintiffs filed a Second Amended Complaint (Complaint) with the Court of Federal Claims that alleged five claims. Count I seeks declaratory relief that the judgment of the ICC is void under Rule of the Court of Federal Claims (RCFC) 60(b)(4). As an alternative to Count I, Count II alleges that the Western Shoshone are entitled to pre-judgment interest on the ICC's award. Count III seeks royalties on minerals mined and extracted under the Treaty of Ruby Valley. Count IV seeks an accounting of the proceeds from the United States' use

---

* The district court transferred the remaining claim for quiet title to the U.S. District Court for the District of Nevada, which subsequently denied the claim. W. Shoshone Nat'l Counsel v. United States, 415 F. Supp. 2d 1201, 1207 (D. Nev. 2006). The National Council and South Fork Band are appealing that decision to the Ninth Circuit. See W. Shoshone, Nos. 06-16252 and 06-16214 (9th Cir.) (consolidated).

of the land. And Count V seeks damages for breach of fiduciary duties arising from the alleged mismanagement of the land and for failure to act in accordance with the rights and duties allegedly created under the Treaty of Ruby Valley.

The Court of Federal Claims dismissed the claims under RCFC 12(b)(1) and 12(b)(6). W. Shoshone Nat'l Council v. United States, 73 Fed. Cl. 59 (2006). The court held that Count I was untimely as a motion under RCFC 60(b)(4) or as an independent action. The court also held that Count I failed to state a claim under RCFC 60(b) because in prior litigation federal courts had considered and rejected the Appellants' contentions. The court dismissed Count II for lack of subject matter jurisdiction and for failure to state a claim, finding that the ICC judgment addressed all of the Shoshone aboriginal title claims and that the Treaty of Ruby Valley did not recognize fee title. The court dismissed Count III for lack of jurisdiction, finding that the claim was within the exclusive jurisdiction of the ICC and barred by the finality provision of the ICCA, which it determined had not been repealed when the ICC was terminated in 1978. The court also dismissed Count IV for lack of subject matter jurisdiction, because it found that the Government's liability had not been established. Finally, the court dismissed Count V as untimely under the six-year statute of limitations provided by 28 U.S.C. § 2501.

The South Fork Band and National Council filed separate notices of appeal, both of which were timely under Fed. R. App. P. 4(a)(1)(B). This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

II

This court reviews de novo the Court of Federal Claims' dismissal of a complaint for lack of jurisdiction under RCFC 12(b)(1) or for failure to state a claim under RCFC 12(b)(6). Samish Indian Nation v. United States, 419 F.3d 1355, 1363 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002). Like the trial court, in considering a motion to dismiss, this court accepts as true all well-pleaded allegations of fact, construed in the light most favorable to the nonmoving party. Bradley v. Chiron Corp., 136 F.3d 1317, 1321-22 (Fed. Cir. 1998). This court also reviews without deference the trial court's statutory interpretation. W. Co. of N. Am. v. United States, 323 F.3d 1024, 1029 (Fed. Cir. 2003).

In Count I of their Complaint, the Western Shoshone seek to set aside the ICC's judgment under RCFC 60(b) because the ICC allegedly denied them due process in reaching its judgment. The Appellants allege that the Bureau of Indian Affairs refused to accept a notice of discharge of the Te-Moak Band's counsel, after the counsel—contrary to the Te-Moak Band's new instructions—continued to pursue a claim that the Western Shoshone's land had been taken and their aboriginal title extinguished.

RCFC 60(b) provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (4) the judgment is void . . . . The motion shall be made within a reasonable time . . . . This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment . . . .

R. Ct. Fed. Cl. (60)(b) (2007).

The Western Shoshone advance two theories to try to set aside the ICC's judgment. They argue that the judgment is void under RCFC 60(b)(4), or that Count I is an "independent action" which should relieve them from judgment.

In 1977, twenty-six years after filing a petition with the ICC and five years after the ICC determined the value of their property, the Te-Moak Band sought to change counsel and its position on the question of the taking of tribal land. The ICC considered but denied the Te-Moak Band's motion to stay the proceedings for this purpose. Instead the ICC entered final judgment. The Court of Claims affirmed the ICC's judgment in 1979. Twenty-four years passed before the Western Shoshone filed this complaint in 2003.

Twenty-four years is not a reasonable time to have waited to challenge the Court of Claims' affirmance. Confronted with a much shorter delay, this court's predecessor, the United States Court of Claims denied a similar procedural challenge in Pueblo of Santo Domingo v. United States, 647 F.2d 1087 (Ct. Cl. 1981). In Pueblo of Santo Domingo, an Indian tribe sought to withdraw from a 1969 stipulation because the tribe's counsel had allegedly acted contrary to the tribe's instructions. In 1973, the ICC entered judgment with respect to the taken Indian property, and the Court of Claims affirmed the judgment on appeal in 1975. The tribe sought again to withdraw from the stipulation in 1980. Id. at 1088. The Court of Claims found that Ct. Cl. Rule 152(b) governed the tribe's motion to set aside the stipulation as void. Id. at 1089.

The predecessor to RCFC 60(b), Ct. Cl. Rule 152(b) "commands that the motion shall be made within a 'reasonable time.'" Id. (citing Andrade v. United States, 485 F.2d 660, 664 (Ct. Cl. 1973)). The Court of Claims enforced the timeliness requirement

strictly because "Congress has expressed its desire that the special Indian claims litigation be wound up by having terminated the operations of the ICC in 1978." Id. As a result, the court held that the tribe's attempt "to withdraw from a stipulation entered nearly twelve years ago falls egregiously outside the permissible range of delay." Id.

This court has adopted as its own law the decisions of the Court of Claims. See Coltec Indus. v. United States, 454 F.3d 1340, 1344 (Fed. Cir. 2006). In view of Pueblo of Santo Domingo and the Appellants' twenty-four year delay, the "reasonable time" requirement of RCFC 60(b) bars the Appellants' tardy challenge under RCFC 60(b)(4). This court detects nothing in the record or arguments in this case that compel departure from the rule and guidance in Pueblo of Santo Domingo.

The National Council argues that an "independent action" like Count I is not subject to the timeliness requirement of RCFC 60(b). Even construing Count I as an independent action (which this court does not accept), this claim would still confront a problem with the statute of limitations in 28 U.S.C. § 2501. Section 2501 provides: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2006). Count I challenges alleged procedural defects in ICC proceedings before the Court of Claims' affirmance in 1979. Thus, the National Council's claim first accrued well outside the six-year statute of limitations of § 2501.

The National Council suggests that the claim did not accrue because the ICC did not submit a final report of its judgment to Congress. The National Council purports to have only recently discovered this fact. These allegations, however, do not alter the accrual date for this claim. The United States Court of Claims affirmed the Western

Shoshone judgment in 1979. The Western Shoshone Distribution Act authorized distribution of the General Accounting Office trust account according to the ICC judgment. Thus, the Court of Claims, the United States Congress, and the General Accounting Office have treated the ICC judgment as final for decades. None of these institutions or their actions depended on submission of a final report from ICC. Further, as the Court of Claims pointed out, a 1978 ICC Final Report (and a 1990 book that reproduced a chart from that final ICC report) fully disclose that the ICC did not intend to issue a report to Congress reiterating that the Western Shoshone case was complete. The absence of a final report should have been apparent for decades. See Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." (citation omitted)).

Because this court finds that Count I is untimely either under RCFC 60(b)(4) or as an independent action, the Court of Federal Claims lacked subject matter jurisdiction over the claim. The trial court thus appropriately dismissed it under RCFC 12(b)(1). As a result, this court does not reach whether Count I fails to state a claim under RCFC 12(b)(6).

As an alternative to Count I, in Count II the Western Shoshone seek to recover $14 billion as pre-judgment interest on the ICC's award from the stipulated date of the taking, 1872, until the date of the award. The Appellants do not challenge on appeal the Court of Federal Claims' finding that the ICC judgment fully compensated the Western

Shoshone for extinguishing their aboriginal title. The Appellants argue they are entitled to interest based on treaty title.

Aboriginal title is the right to exclusive possession that Indian tribes hold as the occupants of the land when the United States arrived. Treaty title is the equivalent of fee title that the United States has acquired by treaty. A taking of property held under treaty title requires compensation under the Fifth Amendment, including interest. See Seneca Nation of Indians v. New York, 206 F. Supp. 2d 448 (W.D.N.Y. 2002) (discussing the distinction between aboriginal and treaty title); Three Affiliated Tribes of Ft. Berthold Reservation v. United States, 390 F.2d 686, 690 (Ct. Cl. 1968) ("Interest from the time of taking is automatically included in order to satisfy the demands of the Fifth Amendment." (citations omitted)).

Thus, this court must inquire whether the Treaty of Ruby Valley recognized that the Western Shoshone held fee title. The United States Supreme Court has addressed that question and determined that the Treaty did not recognize such title. Instead of acknowledging "any exclusive use and occupancy right or title of the Indians," the Treaty was "a treaty of peace and amity with stipulated annuities for the purposes of accomplishing those objects and achieving that end." Nw. Bands, 324 U.S. at 346. As the United States Court of Appeals for the Ninth Circuit recognized, the Treaty "acknowledged the territories claimed by the Shoshones without 'recognizing' title so as to establish a property interest compensable under the Fifth Amendment." United States v. Dann, 873 F.2d 1189, 1200 n.8 (9th Cir. 1989) (citing Nw. Bands, 324 U.S. at 348).

Appellants argue that the Supreme Court in Northwestern Bands interpreted only the Box Elder Treaty, not the Treaty of Ruby Valley. Appellants seek to distinguish those two treaties because the former included an amendment that expressly stated that treaty title was not conveyed, while the latter treaty did not. To the contrary, the Supreme Court's reasoning and conclusions cover the Treaty of Ruby Valley. In Northwestern Bands, the Supreme Court discussed all of the treaties in which the Union entered with the Shoshone Indians in 1863 that were "similar in form." 324 U.S. at 343. The Court specifically referenced the Western Shoshone treaty and stated that "nowhere in any of the series of treaties is there a specific acknowledgment of Indian title or right of occupancy." Id. at 348. The Supreme Court read the amendment to the Box Elder Treaty, but it did not find that the amendment's absence from the Treaty of Ruby Valley implied that the Union intended to convey title.

Moreover, this court does not find any language in the Treaty of Ruby Valley that suggests that the Union intended to convey title to the Western Shoshone. As Article 6 of the Treaty reflects, the Union merely permitted the Western Shoshone to continue occupying the lands defined by Article 5. Permissive occupation does not imply a grant of title. See Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 278-79 (1955) (finding that for the Government to convey rights "there must be the definite intention by congressional action or authority to accord legal rights, not merely permissive occupation").

Further, the United States' actions after adopting the Treaty are inconsistent with an interpretation that the Treaty of Ruby Valley conveyed title. Rather, the United States' actions confirm that it considered the territory covered by the Treaty to be in the

public domain. "School lands were granted. National forests were freely created. The lands were opened to public settlement under the homestead laws . . . ." Nw. Bands, 324 U.S. at 346 (citations omitted). The United States administered the territory "as though no Indian land titles were involved." Id.; see also Te-Moak Bands, 18 Cl. Ct. at 83.

Because the Treaty of Ruby Valley did not recognize that the Western Shoshone held fee title in the disputed territory, this court agrees with the Court of Federal Claims that Count II fails to state a claim under RCFC 12(b)(6).

In Count III, the Western Shoshone seek royalties on minerals mined and extracted under the Treaty of Ruby Valley. The Government argues in part that the finality provision of the ICCA bars the Appellants' claim for royalties. The South Fork Band responds that ICCA does not bar Count III because the Treaty of Ruby Valley is ambiguous with respect to the payment of royalties after 1882, and that Count III seeks royalties that accrued after 1946.

The finality provision of the ICCA provides: "A final determination against a claimant made and reported in accordance with the Act shall forever bar any further claim or demand against the United States arising out of the matter involved in the controversy." 25 U.S.C. § 70u(b) (1976) (omitted 1978). The ICC found that the Western Shoshone's aboriginal title had been extinguished in 1872 and awarded the Western Shoshone $26,145,189.89 for all claims arising out of territory described in the Treaty of Ruby Valley and to which they claimed aboriginal title.

The Court of Claims affirmed the ICC determination. The award included $4,604,600 for minerals extracted from the land in Nevada before the taking. Thus, the

ICC conclusively resolved the Western Shoshone's claim for royalties. Cf. Dann, 873 F.2d at 1200 (finding on remand from the Supreme Court that the ICC's judgment with respect to the Treaty of Ruby Valley and the Western Shoshone's interest in the territory described in it barred the Danns from "asserting the tribal title to grazing rights just as clearly as it bars their asserting title to the lands"); W. Shoshone Nat'l Council v. Molini, 951 F.2d 200, 203 (9th Cir. 1991) ("The Commission's general finding that title had been extinguished therefore also operates to bar the Shoshone from asserting hunting and fishing rights based on the Treaty of Ruby Valley." (citation omitted)). Because the finality provision of the ICCA limits the Government's waiver of sovereign immunity, and because that provision bars Count III, the Court of Claims correctly dismissed the claim for lack of subject matter jurisdiction under RCFC 12(b)(1).

Counts IV and V fail for the same reason. Count IV seeks an accounting of the proceeds from the Government's use of the land described in the Treaty of Ruby Valley. Count V seeks damages for the Government's alleged breach of fiduciary duty arising from the alleged mismanagement of the land described in the Treaty and for failure to act in accordance with the rights and duties allegedly created under the Treaty. Assuming that the Treaty imposed a fiduciary duty on the Government, the finality provision of the ICCA and the Court of Claims' affirmance of the ICC's final determination with respect to the Western Shoshone's aboriginal rights to the territory extinguished any claim for an accounting or breach of fiduciary duty with respect to that territory or such revenue. Indeed, the Te-Moak Bands included a claim for an accounting in their original petition to the ICC. The ICC considered that claim in reaching its final determination, and, as discussed above, in 1987 the Court of Claims

dismissed as untimely a motion by the Appellant Timbisha Shoshone Tribe and two other Western Shoshone tribes to intervene to pursue accounting claims allegedly arising after the 1946 cutoff date prescribed by the ICCA. See Te-Moak Bands of W. Shoshone, 18 Cl. Ct. at 83-85, 89.

This court therefore affirms the Court of Federal Claims' dismissal of the Appellants' claims under RCFC 12(b)(1) and 12(b)(6).

AFFIRMED

COSTS

Each party shall bear its own costs.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: [signature] Date: 7/14/08